CATHARINE S. GIBSON, Respondent, *v.* THE AMERICAN MUTUAL LIFE INSURANCE COMPANY, Appellant.

*Evidence—Religious Belief—Life Insurance—Condition of Policy—Attending Physician.*

In an action to recover for an insurance upon the life of the deceased, it is incompetent to inquire into the religious faith of the deceased, with a view of influencing the question whether, in such case, death was occasioned by an intent of self-destruction, or of accident.

To assume that a belief in Christianity will prevent or tend to prevent the commission of suicide, or that Atheism will tend to produce such an effect, is to adopt a principle too subtle, speculative, and remote, to be recognized in law.

To ask the assistance of one who had been the family physician, but who had long since ceased to practice, while waiting the arrival of the regular physician, who had been sent for, does not constitute the employing such ex-physician under the provisions of the policy requiring the statement of the attending physician.

This was an action on a policy of insurance on the life of Marcus W. Gibson, issued March 8, 1858, for seven years, payable to Catharine S. Gibson, his wife.

The defences set up in the answer, and insisted upon on the trial, were :

First. That the proof furnished " omitted to state truly the cause of the death of said Marcus."

Second. That " the said Marcus W. Gibson committed suicide, by designedly shooting and wounding himself, with the design and for the purpose of producing death, of which shooting and wounding said Marcus died."

The proofs furnished, and which were produced by the Defendant on the trial, and offered in evidence, were the certificate of the officiating clergyman at the funeral of Gibson, and the statement of John G. Meachem, the attending physician of Gibson during his last sickness, made in answer to printed interrogations furnished by the Defendant; and the affidavit of the Plaintiff.

The condition required that among other things, the proof

should contain the name of the physician or physicians, and other friends in attendance, and the place and date of burial, . . the affidavit of the medical attendance, &c.

Gibson died on the 24th day of March, 1860. The Defendant proved, by Gibson's declarations, that "he was crossing a log with his gun in his hand; that his foot slipped and he fell off, and the gun went off and shot him through the bowels."

After receiving the wound which caused his death, Gibson was brought to his own home, and lived about twenty-four hours.

The Defendant put the following question to one of the witnesses : "Have you had an opportunity of knowing his religious sentiments?" and proposed to show that Gibson was an Infidel. This evidence was excluded by the Judge, and the Defendant excepted to his decision. To another witness the Defendant put the question: "Did you know his religious sentiments?" and offered to show that Gibson was an Atheist. This evidence was excluded, and the Defendant excepted to the decision. The jury rendered a verdict for the Plaintiff, and, upon an appeal to the General Term, the judgment was affirmed.

The Defendant now appeals to this Court.

*C. G. Munger* for Appellant.

*D. U. Thayer* for Respondent.

HUNT, CH.J.—In his elaborate argument the Defendant's counsel insists, as his first ground of appeal, that the preliminary proofs were deficient, in that they did not contain the affidavit or certificate of Dr. Bartlett, as one of his attending physicians. Although he had been a practising physician, Dr. Bartlett was not such at the time of the death of Gibson, and had not been for some years previously. He was one of the sympathizing friends, who, on occasions of accident or death, are present to give aid and comfort. Mrs. Gibson, immediately on the arrival of her husband, despatched a messenger for Dr. Meachem, the family physician. In the mean time, the wounded man being in great pain, some one suggested that Dr. Bartlett had better make an examination of his wounds. Mrs. Gibson assenting, he did so,

and also gave him morphine to relieve his pain.   Upon the arrival of Dr. Meachem, he took charge of the case.   It does not appear that Dr. Bartlett acted in any other than a friendly capacity, or that he had at any time desired, or expected, compensation for his services.   I do not know that he could claim compensation in money for his kind offices, any more than could the other neighbors present and assisting.   The Defendant did not make any request that this question should be submitted to the jury, but claimed, as a matter of law, that Dr. Bartlett was an attending physician.

This claim cannot be sustained.   The question in contention at the Circuit was, whether the death of the deceased was accidental, or whether it was a case of intentional self-destruction. To aid in elucidating this inquiry, the Defendant insists that he had the right to show that the deceased was an Infidel and an Atheist, and thence to draw an argument in support of the theory of intentional suicide.   The Defendant insists upon the competency of this evidence, upon the further ground that every man is presumed to be a Christian ; that the Christian religion prohibits self-slaughter; that this presumption may operate upon the minds of the jury, and should be allowed to be overthrown by the testimony offered.

It is not necessary to say how far, or how precisely, the presumption of personal Christianity exists.   That we live in a Christian country is certainly acknowledged by the laws of the land, which prohibit blasphemy and profanity, and enjoin the observance of Sunday.   That we believe in a governing Providence, by whom crime will be punished, and virtue rewarded, is assumed in every oath that is administered.   To say, however, that every man is presumed to be a personal Christian, upon whose mind, and upon whose actions, the precepts of the Gospel exercise an influence, is so much against our common experience, that it cannot be admitted as a legal principle.   It may be argued, however, that a man may hold this belief, although his actions be not at all times influenced by it. .

This is probably true; and here arises the difficulty in the ad-

mission of the evidence offered. It is speculative, uncertain, remote, and based upon no well-defined legal principles. Consider the great variety of creeds held by those calling themselves Christians. We find not only the Roman Catholic, the Episcopalian, the Presbyterian, the Methodist, and Baptist, but a large class who believe in the punishment of sin in this world, and the ultimate salvation of the whole human race. These are all Christians, in every acceptation of that term. They all acknowledge the inspiration of the Holy Scriptures, and the obligation of its commands.

In what way, and how far, do these systems of belief operate upon the conduct of man? Is it certain that he who believes in the eternal punishment of the impenitent in a future world, is a better observer of the laws of his country, and more free from actual crime, than he who denies that doctrine? Or is it certain that he who believes in the final salvation of all men would refrain from an offence which he would have committed had he believed there was no future state? No man can answer with certainty. Does the fact that a man believes in the Christian religion furnish legal evidence that in a particular case he has not violated the laws of God, or of his country?

Experience teaches us that not only believers in the Christian religion, but those who for years have had the highest evidence that they might expect the ultimate reward of the true Christian, are guilty of grave offences, moral and legal. The law takes man as he is, with his passions, his appetites, his infirmities, and with his education, his moral training, and his religion. With all these elements, his life is a struggle and a contradiction. What his actions will be, can be determined by no form of belief, and by no fixed principle of law. Each man's case will be different from that of his neighbor, and from day to day will be different from his own.

The "Infidel" is one who does not recognize the inspiration or obligation of the Holy Scriptures, or the generally recognized features of the Christian religion. The "Atheist" is one who does not believe in the existence of a God.

The result of this absence of belief upon his actions is speculative entirely. Does his soul shrink back at the idea of annihilation? We know not. He may not admit the existence of a soul; and the eternal rest of the grave may form his idea of Paradise. On the one side would stand the idea of annihilation; and on the other, that of an offended God.

Who can say, as a matter of fact, which would produce the strongest effect upon the human mind? Is there any feeling or principle stronger than that instinctive dread of death which all men feel, and which neither the faith of the Christian, nor the reasoning of the Atheist can overcome? It does not depend upon life or faith. It is instinctive and common to all men.

It would, in my judgment, be incompetent to impeach one's conduct, and to adjudge one's motives and principles, upon the proposed idea. To adjudge that a man's belief in Christianity will prevent, or tend to prevent, the commission of suicide, or that Atheism will produce, or tend to produce, a contrary effect, is to adopt a principle more subtle and speculative, more uncertain and more remote, than the law can recognize. If a sound argument, it would be applicable, to some extent, in every case where character was in evidence. Would it be a just ground of impeachment of the good character of a party to an action, that he is an Infidel, or an Atheist? If Gibson had been the Plaintiff in an action of slander, could his opponent have reduced his damages by showing his belief in these respects? If he had been indicted for murder, and the question of character had been introduced into the issue, could the prosecution have attacked him by showing his scepticism? Or could he have sustained his character by proof that he held a religious belief? Such a suggestion finds no countenance in the authorities. Conduct and life, as distinguished from belief, give the standard of character.

In law it would be a totally immaterial circumstance. It affords no certain or practical test of conduct. The offer in the present case is based upon the same idea; and the argument

in its defence, although plausible and attractive, cannot be sustained.

Judgment should be affirmed, with costs.

All concur.

Affirmed.

JOEL TIFFANY,
State Reporter.
